IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ANESHA GARNETT, *on behalf of T.W.* (minor child) | ) ) | Case No. 3:23-cv-00716 |
| | ) | JUDGE JAMES G. CARR |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

## I.    Introduction

Plaintiff Anesha Garnett ("Garnett") seeks judicial review of the final decision of the Commissioner of Social Security denying her application for supplemental social security income ("SSI") on behalf of her minor child, T.W., under Title XVI of the Social Security Act. Garnett raises one issue on review of the ALJ's decision, arguing that the ALJ improperly weighed the evidence presented to determine that T.W. did not have a marked limitation in at least two functional domains.  This matter is before the court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).  The matter was automatically referred to me for preparation of a report and recommendation pursuant to Local Rule 72.2(b)(1).

Because substantial evidence supports the ALJ's decision and because Garnett has failed to identify any error of law in the ALJ's evaluation of her claim, I recommended that the final decision of the Commissioner be AFFIRMED.

## II.     Procedural History

Garnett applied for SSI benefits on behalf of her minor child, T.W., on May 17, 2019.

Tr. 83.  After an initial hearing on November 24, 2020, Administrative Law Judge ("ALJ")

Dianne Mantel issued a decision that denied Garnett's claim for benefits on December 21, 2020.

Tr. 109.  The Appeals Counsel remanded the matter to the ALJ on November 22, 2021.  After

remand, the ALJ conducted a second hearing on March 8, 2022 and denied Garnett's claims on

behalf of T.W. in a May 10, 2022 decision.  On February 9, 2023, the Appeals Counsel denied

further review, thereby rendering the ALJ's decision the final decision of the Commissioner.

Garnett instituted this action on April 6, 2023 to obtain judicial review of the Commissioner's

final decision.

## III.    Evidence

### A.     Personal Evidence

T.W. was born in December 2012 and was of school-age child on May 17, 2019, the

alleged disability onset date, and remains a school age child.  Tr. 20.

### B.     Medical Evidence

From 2017 through June 2018, T.W. underwent speech and language therapy based on

his diagnosis of an articulation disorder and mixed expressive-receptive language disorder.  Tr.

432–446. During this treatment, T.W. was noted to be progressing inconsistently due to

difficulties with attention and cooperation, and his mother ultimately stopped treatment.  Tr. 443.

In January 2019, T.W. was assessed with oppositional defiant disorder (ODD) during an

examination by his pediatrician.  Tr. 400.  Other records, from the same pediatrician, do not

indicate this finding and, in an examination later in 2019, T.W.'s psychiatrist did not reach the

same diagnostic conclusion; rather, he diagnosed T.W. with intermittent explosive disorder (IED).  Tr. 611.

On April 24, 2019, T.W. was hospitalized due to anxiety and/or agitation accompanied with hallucinations that was attributed to acute transverse myelitis through MRI imaging.  Tr. 412–428.  The hospital records indicate that T.W. improved with steroid medication and was discharged within seven days.  Tr. 412–428.  The ALJ noted that T.W. was able to return to school within two days of discharge from the hospital.  Tr. 412–428.

During his April 2019 hospitalization, T.W. experienced incontinence which resulted in an appointment with urology in August 2019, because his symptoms did not resolve following his discharge.  Tr. 481, 487, 657, 770 (all documenting the same August 9, 2019 assessment).  Urology noted that T.W.'s incontinence was likely a result of neurologic involvement of the bladder after the transverse myelitis and ordered additional testing.  *E.g.*, Tr. 772.  Additional testing, including an ultrasound of T.W.'s kidneys was unremarkable, and an ultrasound of his bladder showed minimal post-void residual of approximately seven milliliters.  Tr. 774.  There was no recommended treatment beyond requiring T.W. to have more of a schedule for urination.  Tr. 772.

In mid-May 2019, T.W. had a psychiatric medication management appointment at which his mother reported he had made a complete recovery from his hospitalization in April and his gait and station were observed to be within normal limits.  Tr. 476–477.

At a neurology visit in mid-June 2019, T.W.'s gait and station were reported as normal, and no neurological deficits were identified on an objective evaluation.  Tr. 505.

Throughout several appointments, T.W. was noted as receiving treatment for various acute medical conditions including dermatitis and an upper respiratory infection and influenza.

3

Tr. 400, 616–618, 631–633. Also, at a wellness examination in June 2019, T.W. was diagnosed with anemia due to inadequate dietary intake. Tr. 639.

In July 2019, at a follow-up neurology visit, T.W. was reported to have had no recurrence of symptoms from his transverse myelitis, and there was no residual weakness, paresthesia, or other neurological symptoms reported. Tr. 490–491. However, his mother stated that he was experiencing some urinary issues. Tr. 491. An objective examination of T.W. showed that he had no sensory deficits, normal strength and reflexes, normal gait, and he was able to perform finger-to-nose and rapid serial opposition without evidence of ataxia, dysmetria or dysdiadochokinesis. Tr. 492. The ALJ also identified that during this visit, the pediatric neurologist remarked that T.W. had made a "great recovery." Tr. 757.

In August 2019, T.W. went to the emergency department due to numbness and tingling in his extremities which resolved without intervention within a few hours. Tr. 758. T.W. was able to walk and move all extremities during this experience without difficulty, and he denied having any pain or numbness. Tr. 758. T.W. was admitted for overnight observation based on his history of transverse myelitis. Tr. 759. But he was discharged the next day. Tr. 761–763.

In September 2019, T.W. underwent MRI imaging of his cervical and thoracic spine, which showed interval resolution of the signal abnormality in the thoracic spinal cord and exhibited his thoracic and cervical spinal cord and conus medullaris were unremarkable in appearance. T.R. 547–548, 571–572, 775–776.

November 2019 treatment notes from an unrelated admission to the emergency department for a fever, indicated that T.W.'s mother said he had completely recovered from the transverse myelitis. Tr. 616. Additionally, the ALJ noted that in December 2019 "claimant's symptoms appeared to be relatively controlled with the slight adjustment to his medication,"

4

after medication changes were implemented in October 2019.  Tr. 29; *see also* Tr. 698.  And, although T.W. "was still having some difficulty handling his anger and calming down after he is upset," Garnett noted that he "was doing great in school and the counselor worked with the claimant to develop skills for calming down and making good choices."  Tr. 698.  Later in December 2019, Garnett informed T.W.'s pediatrician that his ADHD medication was working well.  Tr. 629, 669.

In a February 2020 appointment, T.W.'s father expressed that there was a notable difference in T.W.'s ability to control his anger after the medication dosage change.  Tr. 704–705.  Garnett also expressed, in a March 2020 therapy session, that T.W. continued to have good behavior and make good choices in and out of school.  Tr. 706.  During a March 2020 therapy session, T.W. was observed to be able to sit and pay attention while he made a necklace and discussed a new friend.  Tr. 704.  Following this session, the therapist determined that T.W. no longer needed to attend individual counseling based on his progress.  Tr. 711.

Later in March 2020, in a medication management appointment, T.W. was noted to have had a few episodes of emotional dysregulation; but his mood was positive, his ADHD symptoms were well managed, he was making academic process, and his sleep patterns were intact.  Tr. 706–707.  Other observations during the mental status examination indicated that, although he was fidgety, T.W. was otherwise cooperative, and his speech, eye contact, affect, attention, thoughts, and judgment were normal to fair.  Tr. 708–709.  However, following this appointment, during a case management appointment in late April 2020, Garnett announced that T.W. would no longer be taking the medication.  Tr. 714.  However, despite being off the medication, Garnett stated that T.W. was doing alright with his symptoms.  Tr. 714.

The ALJ summarized that in July 2020, T.W. underwent a developmental assessment during his annual wellness checkup in which he was noted to be "argumentative and easily embarrassed" but also that he "enjoys friends" is "idealistic and interested in projects and collections."  Tr. 30, 675–677.

In October 2020, Garnett informed T.W.'s case manager that he was having anger issues, but that they were controllable or manageable and that he was doing "ok" in school.  Tr. 716. Although other observations were normal or fair during a mental status examination later in October, T.W. was restarted on his previous medication plan.  Tr. 719–722.

School records from November 2020, indicate that behavioral difficulty caused the removal (suspension) of T.W. for two days after he was removed from the bus at dismissal.  Tr. 359, 367.  However, in a December 2020 medication management appointment, Garnett expressed that T.W. had shown some improvement with his ADHD symptoms during the day, but that first thing in the morning and later in the evening he struggled.  Tr. 789.  To address this concern, an additional afternoon dosage of ADHD medication was prescribed.  Tr. 790–791.

In March 2021, at T.W.'s next medication management appointment, it was indicated that T.W. was no longer taking his medication; and he was advised to restart his medication, including the afternoon dosage.  Tr. 793.

Notes from T.W.'s next medication management appointment, in November 2021, indicate that he was having interval improvement in his ability to complete schoolwork and regulate his attention and impulsivity, though he was still having some difficulty in the afternoon when his medication wore off.  Tr. 797.  It is also noted that T.W. was improving on a different ADHD medication, Quillivant, that had been prescribed to his twin brother.  Tr. 797.  The mental status evaluation indicated that T.W. was hyperactive and distracted during the appointment, but

6

he was otherwise cooperative, alert, and oriented. Tr. 798–799. T.W. was prescribed Quillivant in addition to an afternoon dosage of his prior ADHD medication. Tr. 800.

In mid-November 2021, T.W. was assigned a new case manager, to whom Garnett expressed that T.W. had experienced anger, temper tantrums, and inappropriate responses to authority figures. Tr. 803. Garnett also expressed that she was interested in obtaining an individualized education program (IEP); and the case manager stated that she would coordinate a school observation for such a purpose, based on Garnett's request and description of various outbursts and suspensions. Tr. 807.

In mid-January 2022, during a case management appointment, T.W.'s ADHD symptoms were noted to be improved, but there had been an incident of anger towards a teacher after T.W. was told not to sleep in class. Tr. 809. It was noted that discussions between the school guidance counselor and T.W.'s case manager revealed that, despite the guidance counselor having worked with T.W. for several years on following directions, building social skills, and listening to authority figures, T.W. still struggled with adjustment and change. Tr. 881. Nonetheless, the ALJ noted that no IEP or 504 behavior plan was in place. Tr. 32.

### C. Testimony

#### 1. T.W.

T.W. testified at the March 8, 2022, hearing, answering a series of questions posed by the ALJ. *See generally* Tr. 60–69. T.W. testified that he was in third grade, he liked to learn in school, that his favorite class is math, and that his least favorite class was art. Tr. 62–63. When asked what he does not like his teachers to do, he said he does not like it when they yell. Tr. 61. He also expressed that he would do his homework during various times at school, such as in art class or during lunch or recess, so that he would not have to do homework when he got home.

Tr. 62.  When he was not in school, T.W. testified that he would play with his friends or his twin

brothers, but that he did not often play with his twin sisters.  Tr. 66.  T.W. stated that he liked to

play baseball with friends in the summer and, when it was cold, he would play video games with

his brother.  Tr. 66-67.

### 2.      Anesha Garnett - T.W.'s Mother

Garnett testified that "he did good" but that "the school thing, [was] not so accurate"

when asked to confirm or explain T.W.'s testimony.  Tr. 69.  She explained that he does play

with friends, and they get along "somewhat" but that he previously had had  "a little issue with

fighting some of his friends and stuff."  Tr. 70.  When asked how he was doing in school

currently, Garnett stated that T.W. was "kind of like up and down" and that she'd had to pick

him up from school the previous week, because he would not settle down.  *Id.*  Garnett testified

that T.W. did not have a behavioral plan at school, but that a school counselor and a therapist

would observe him.  *Id.*  She stated that the week before the hearing, the school sent a notice that

T.W. would be put into "a program to learn how to self-control, how to handle himself instead,

of you know, like spiraling out of control and throwing chairs and stuff."  Tr. 72.  Garnett further

described that T.W. had had a series of grades ranging from B's to a couple of F's.  Tr. 73.  She

explained that the F's were, according to his teacher, a result of his behavior because "he can't

sit still enough to do the work or he gets in trouble, gets suspended, gets the emergency

removal."  Tr. 73.

Garnett testified that T.W. saw his psychiatrist about every three months and had seen his

psychiatrist recently in relation to her testimony.  Tr. 71–72.  At this recent appointment, the

doctor indicated that there might need to be a change to T.W.'s medication, but that, for now, he

should be given his medication every day rather than only on days when he was in school.  Tr.

71.  According to T.W.'s explanation to his psychiatrist, Garnett explained that when he got angry, he "really don't know what he's doing . . . he said like something in his head explodes and he just like black[s] out."  Tr. 74.

As for different forms of discipline used when T.W. acted out, Garnett stated that she would usually take his phone or take away one of his games but that this was not helpful in controlling his behavior.  Tr. 75.  During the current school year, Garnett testified that T.W. had had four emergency removals and eight in school suspensions, but no out of school suspensions because the school cannot impose out of school suspension upon a third grader "unless it's something like major major."  Tr. 76.

Garnett testified that T.W. would have the same sorts of episodes at home as he did at school in which he would fight with his siblings.  Tr. 76–77.  She also testified that, in her opinion, T.W.'s behavior had gotten worse since the first ALJ hearing.  Tr. 78.  Specifically, his "temper is worse" and she "dread[s] even taking him to the store anywhere because you just – you never know when he's going to spiral out of control and start throwing things at the store[.]" Tr. 78.

### 3.  Thomas Wright, Jr. - T.W.'s Father

T.W.'s father, Thomas Wright, Jr., provided a testimonial statement during the March 8, 2022 hearing, which generally confirmed Garnett's testimony.  Tr. 80.  Wright stated that he saw T.W. every day and also experienced or otherwise observed the same behavior, such as "want[ing] to fight all the time, hitting, throwing things."  *Id.*  Additionally, consistent with Garnett's testimony, Wright stated that the medication helps, but "after that medicine wears off, he gets – it's back to the same normal."  *Id.*

### D.      Opinion Evidence

#### 1.      State Agency Consultants

State agency consulting experts, Aracelis Rivera, Psy.D. and Bruce Mirvis, M.D. (on initial consideration) and Sandra Banks, Psy.D. and Louis Goorey, M.D. (on reconsideration), provided analysis during the determination of the initial claim. The ALJ considered their opinions again in her 2022 decision. *See e.g.*, Tr. 22. Both of the psychological examiners found either a "less than marked" limitation or "no limitation" in all domains, except for the domain of "interacting and relating with others," in which both found a "marked" limitation. Tr. 92, 103. In support of a finding of a marked limitation in that domain, Dr. Rivera noted from the records that: "[T.W.] is . . . hyperactive & impulsive at home. Mom reports . . . that he is defiant and oppositional, reacts negatively when he doesn't get his way, and can be aggressive at home & at school. He will make threats to hurt himself or others when he's angry. MSE notes friendly & cooperative, mood described as good though reactive w/a low frustration tolerance." Tr. 92. Similarly, Dr. Banks noted: "[T.W.] noted to still have issues w/ hyperactivity despite meds/tx. He's impulsive and hyperactive at home. Per mother, he's also defiant and oppositional; he has tantrums when he doesn't get his way. Also noted to be aggressive both at home and in school. He has a hx of threatening to hurt himself & others when upset. However, on recent MSE, he was cooperative and interactive appropriately." Tr. 103.

#### 2.      Teacher Questionnaire & Statement

T.W.'s first grade teacher, Deborah Coffey, submitted a statement, dated October 22, 2019, and responses to a teacher questionnaire, dated January 21, 2020. Tr. 369–378.

Coffey's opined that during "the first month and a half of school [T.W.] was a model student. He was in control of his body and his speech." Tr. 370. But she further expressed that

"in the past week and a half or so [meaning early October], [T.W.] ha[d] begun to act out . . . after recess around 12:00." Tr. 370.  She listed specific examples of when he had recently acted out, for instance: (1) he threw a stool at a trash can and broke the lid, (2) he tipped out a container of about 300 crayons, (3) he threw trays containing homework papers on the floor, and (4) he recently hid in the closet and the ran out of the room.  Tr. 370.  Notably, Coffey concluded that T.W. "is a great, helpfully boy *when he is in control of himself*.  [But,] [w]hen he is out of control, neither he nor the rest of the class gets any learning accomplished."  Tr. 370 (emphasis added).

Coffey's responses to the teacher questionnaire further identified that "[t]he end of the day is when [she had] the most trouble with [T.W.].  He tries to keep in control, but [she] can see that he has nearly had it with school [by the end of the day.]"  Tr. 376.  She also stated that, although she had some apprehension based on behavior she witnessed when he was in kindergarten, "[a]t the beginning of the school year[, T.W.] was the model student as far as behavior."  Tr. 377.  Coffey described that around October, T.W. started acting out and challenged her authority; however, she since she stopped "feed[ing] into that behavior" and giving him attention when he acted out, "his behavior has become so much better."  Tr. 377.  She further described that she could tell when he has "reached his limit" and, at that point, she would redirect him.  Tr. 377.  Additionally, she provided an example where T.W. got angry about something and, rather than hit the student, "he removed himself from the situation and sat away from the others."  Tr. 377.

## IV.    Standard for Child Disability Claims

The standard for evaluating a child disability claim differs from that used for an adult's claim.  42 U.S.C. § 1382c(a)(3)(C); *see also Miller ex rel. Devine v. Comm'r of Soc. Sec.,  37 F.*

App'x 146, 147 (6th Cir. 2022). A child is considered disabled if he has a "medically determinable physical or mental impairment that results in marked and severe functional limitations and can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process. 20 C.F.R. § 416.924(a). At Step One, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At Step Two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At Step Three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals, or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1. 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the Listings, the Commissioner must assess the functional limitations caused by the impairment. 20 C.F.R. § 416.926a(a). This is done by evaluating how a child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [oneself]; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)–(vi). If a child's impairment results in "marked" limitations in two or more domains, or an "extreme" limitation in one domain, the impairment functionally equals the Listings, and the child will be found disabled. 20 C.F.R. § 416.926a(d).

## V.    The ALJ's Decision

The ALJ made the following findings in her May 10, 2022 decision:

1.    T.W. was born on December 15, 2012. Therefore, he was a school-age child on May 17, 2019, the date the application was filed, and is currently a school-aged child.

2.    T.W. has not engaged in substantial gainful activity since May 17, 2019, the application date.

3.      T.W. has the following severe impairments: asthma and psychological conditions variously described as attention deficit hyperactivity disorder ("ADHD") and intermittent explosive disorder.

4.      T.W. does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listings.

5.      T.W. does not have an impairment or combination of impairments that functionally equals the severity of the Listings.

Tr. 20, 23, 24.

In determining whether T.W. had an impairment or combination of impairments that functionally equaled the severity of the Listings, the ALJ found that T.W. had:

- <u>less than a marked</u> limitation in acquiring and using information;
- <u>less than a marked</u> limitation in attending and completing tasks;
- <u>less than a marked</u> limitation in interacting and relating with others;
- <u>no</u> limitation in moving about and manipulating objects;
- <u>a marked</u> limitation in the ability to care for himself; and
- <u>less than a marked</u> limitation in health and physical well-being.

Tr. 25, emphasis in original.

Based on his overall findings, the ALJ determined that T.W. had not been under a disability since May 17, 2019, the date of application and alleged onset date, and was not entitled to benefits.  Tr. 44–45.

## VI.    Law & Analysis

### A.      Standard of Review

The court's review is limited in determining whether substantial evidence supported the ALJ's findings of fact and whether the ALJ correctly applied the appropriate legal standards. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision"). And substantial evidence exists "if a reasonable mind might accept the relevant evidence as adequate to support a conclusion," *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405-406 (6th

Cir. 2009) (internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion, *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

The court must also determine whether the Commissioner applied proper legal standards. If not, the court must reverse the Commissioner's decision, unless the error of law was harmless. *See e.g.*, White v. Comm'r of Soc. Sec., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits of deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and result." *Fleisher v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

### B.  Substantial Evidence Supports the ALJ's Determination that T.W. Was Not Markedly Limited in His Ability to Interact and Relate with Others.

Plaintiff's claims that the ALJ erred are limited.  The only matter she raises on behalf of her minor son related to the ALJ's finding that T.W.'s impairments did not functionally equal the severity of the Listings.  And from among those six findings, plaintiff challenges only one: that T.W. had less than a marked limitation in the "interacting and relating with others."   Because I find that the ALJ's finding on that domain was supported by substantial evidence, I recommend that the ALJ's final decision be affirmed.

A child's disability is "functionally equal" to the severity of a disability Listing when he has a marked limitation in at least two out of six domains of functioning, or an extreme limitation in just one.  20 C.F.R. § 416.926a(a); *Elam ex rel. Golay v. Comm'r*, 348 F.3d 124, 127 (6th Cir. 2003).  A "marked" limitation is "more than moderate" and "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(a), (e)(2).

Here, the ALJ found that T.W. had no extreme limitations and only one marked limitation – in the ability to care for himself.  Tr. 25.  Because only one marked limitation was found, the ALJ concluded that T.W.'s impairments did not functionally equal the severity of any Listing.  Garnett argues that T.W. has a marked limitation in two domains: "interacting and relating with others" and "caring for oneself."  ECF Doc. 8, pp. 8–10.  The Commissioner disagrees, arguing that substantial evidence supported the ALJ's finding that T.W. had a less than marked limitation in the domain of interacting and relating with others.  ECF Doc. 11, pp. 9–10.  What makes this case a close call is that the ALJ found a marked limitation in one domain: "caring for yourself;" but the state agency reviewers found a marked limitation in another: "interacting and relating with others."  The ALJ found the state agency evaluators' opinions not persuasive on that finding.  The ALJ also found the state agency evaluators' opinions not persuasive to the extent they found a less than marked limitation in the domain of "caring for yourself."  In making these findings, the ALJ quoted extensively from the record.[1]

In the domain of interacting and relating with others, the regulations provide that children should be able to effectively communicate with others through expressions, gestures, and actions in different contexts throughout the day.  SSR 09-5p, 2009 WL 396026 (S.S.A. Feb 17, 2009).  The child should also "be able to form relationships with family members, friends, and others,

---

[1] Notably, Garnett has not argued that the ALJ erred in her handling of the opinion evidence.  Rather, she simply disagrees with the way the ALJ weighed the evidence, including the evidence from the state agency evaluators.

and to sustain those relationships over time in an age-appropriate manner." *Id.* The issue is not whether there is any limitation in this domain, but whether the degree of limitation is "marked" (meaning more than moderate). As stated above, this court's review is limited to determining whether substantial evidence supports the ALJ's finding that this domain was not markedly limited. *See Elam*, 348 F.3d at 125; *see also Blakley*, 581 F.3d at 406 ("The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decision makers can go either way.").

In support of her argument, Garnett highlights a portion of SSR 09-5p (the "Ruling") that discusses the differences between the domains of interacting and relating with others on the one hand and caring for yourself on the other. My review of how the ALJ applied SSR 09-5p does not lead me to discredit the ALJ's determination, even if I might have reached a different conclusion. The Ruling explains that the difference between the domains of "interacting and relating with others" and "caring for yourself" boils down to the claimant's relationship to "other people" and "to self," respectively. *See* SSR 09-5p. "The domain of 'interacting and relating with others' involves a child's feelings and behavior in relation to other people (as when the child is playing with other children, helping a grandparent, or listening carefully to a teacher)." *Id.* (underline in original). In contrast, "[t]he domain of 'caring for yourself' involves a child's feelings and behavior in relation to self (as when *controlling stress* in an age-appropriate manner)." *Id.* (underline in original, italics added). However, the Ruling recognizes that "[s]ome impairments may cause limitations in both domains. For example, a boy with Oppositional Defiant Disorder who refuses to obey a parent's instruction not to run on a slippery surface, disrespects the parent's authority and endangers himself by running instead of walking.

In this case, the child's mental disorder is causing limitations in the domains of 'interacting and relating with others' <u>and</u> 'caring for yourself.'"  *Id.* (underline in original).

Importantly, the stated purpose of SSR 09-5p is to explain the Commissioner's policy about the domain of "interacting and relating with others" and to provide consolidated information about that domain.  *See* SSR 09-5p (section entitled "Purpose:").  The Ruling does not state that any of the examples provided would *per se* constitute a "marked limitation." Rather, the Ruling indicates that "the listings describe impairments we consider severe enough to cause 'marked and severe functional limitations.'"  SSR 09-5p, n.5.

The regulation itself provides further clarity.  Immediately preceding the general articulation of the six domains used to consider functional equivalence for children, the regulation states that SSA recognizes "that limitations of any of the activities in the examples do not necessarily mean that a child has a 'marked' or 'extreme' limitation" as defined by the regulations.  20 C.F.R. § 416.926a(b)(1).  Further, after a caveat that "the examples do not necessarily describe a 'marked' or 'extreme' limitation," the regulation provides examples of limitations related to the domain of "interacting and relating with others:"

      i.     You do not reach out to be picked up and held by your caregiver.
     ii.     You have no close friends, or your friends are all older or younger than you.
    iii.     You avoid or withdraw from people you know, or you are overly anxious or fearful of meeting new people or trying new experiences.
    iv.     You have difficulty playing games or sports with rules.
     v.     You have difficulty communicating with others; e.g., in using verbal and nonverbal skills to express yourself, carrying on a conversation, or in asking others for assistance.
    vi.     You have difficulty speaking intelligibly or with adequate fluency.

20 C.F.R. § 416.926a(i)(3)(i)–(vi).

Garnett's argument appears to mirror an example provided in SSR 09-5p, which describes limitations that can be found to impact both the domain of "caring for yourself" and the

domain of "interacting and relating to others" in a child who has Oppositional Defiant Disorder. Such a child might refuse to obey a parent's instructions, which could, in turn, endanger both the child himself and others. *See* ECF Doc. 8 at 11 (citing the example of a boy with Oppositional Defiant Disorder). Given the facts in the administrative record, however, this example does not necessarily support Garnett's claims. Importantly, the ALJ highlighted that T.W. was never diagnosed with Oppositional Defiant Disorder by any of his mental health care providers. Tr. 22, *see also* Tr. 400 (indeed, the sole instance of a diagnosis of Oppositional Defiant Disorder was in a January 2019 appointment with T.W.'s pediatrician). Although Garnett has cited some evidence which could support the finding of a marked limitation in the domain of "interacting and relating with others," (including testimony of T.W.'s first grade teacher and state agency consultant opinions), *see* ECF Doc 8, p. 11–12, these pieces of evidence do not exist in isolation or mandate that the ALJ had to find a *marked* limitation after consideration of all of the evidence together. Notably, the ALJ did find that the evidence supported some limitation in this domain, just not a "marked" limitation. Garnett cannot avoid the fact that the ALJ's ultimate determination of a "less than marked" limitation in the domain of interacting and relating to others was supported by substantial evidence. The fact that the evidence could also have supported the finding that Garnett argues for does not mean that it did not also support the ALJ's finding. In such a circumstance, we lack the authority to reject the ALJ's decision. *See Kinsella*, 708 F.2d at 1059.

In finding that there was a less than marked limitation in the domain of interacting and relating to others, the ALJ provided detailed reasoning regarding the persuasiveness of the state agency medical consultants opinions. Specifically, she explained why the state agency consultants' opinions were not entirely persuasive. Tr. 33–34. The ALJ acknowledged several

18

pieces of record evidence that showed difficulty in the domain of interacting and relating to others and acknowledged that the state agency consultants found a marked limitation in this domain.  Tr. 33–34.  However, the ALJ ultimately concluded that finding a marked limitation in that domain was not warranted because of inconsistent and conflicting record evidence, which showed that T.W.'s "behavior was regularly more manageable after he began treatment in the form of case management, counseling and medication management services."  Tr. 30–31, 34 (using words such as "despite" and "yet" and identifying conflicts between stated symptoms and mental status examination records and medication planning).  A finding of marked limitation in this domain was further contradicted by evidence which showed that "[T.W.] was consistently observed to be friendly and/or cooperative at the mental health appointments."  Tr. 34.  The ALJ further highlighted that T.W. "was involved in sports and hobbies, he had a best friend, he was involved in group activities, and he had appropriate peer interaction[.]"  Tr. 34.  Finally, the ALJ explained that she also considered: (i) T.W.'s communication skills, (ii) that he did not have an IEP or 504 school behavioral plan, and (iii) that he had "socially appropriate behavior for his age."  Tr. 40–41.  Based on the evidence of record, the ALJ found that this evidence "does not support the State agency consultants' opinion that the claimant has a marked limitation in the domain of interacting and relating with others."  Tr. 34.  This was a sufficient analysis.

It also bears mention that the state agency medical consultants did not find that T.W. had a marked limitation in the domain of caring for oneself.  The ALJ, however, on her analysis of the medical evidence, found that this opinion too was not persuasive.  Tr. 34–35.  She explained why a finding of less than marked limitation in that domain was not consistent or supported by the medical evidence; and the ALJ ultimately found that T.W. had a marked limitation in this domain, based on numerous records and testimony which showed, for example, that he "had

difficulty controlling his anger" and other issues with his self-control.  Tr. 34.  As articulated by the ALJ, this evidence supported the conclusion that the behavior described represented a marked limitation in T.W.'s ability to self-control, maintain, and care for his own behavior, but not a marked limitation in the domain of interacting and relating with others.  Tr. 34.

As SSR 09-5p explains, the domains of interacting and relating with others and caring for oneself can both be limited by the same or similar impairments.  They are, nevertheless, distinct domains and a finding of marked limitation in one does not necessitate a finding of marked limitation in the other.  *See* SSR 09-5p (explaining the "*difference*" between the two domains and recognizing that "some impairments *may* cause limitations in both" but not that they must) (emphasis added).  The ALJ appropriately articulated how the state agency consultant's findings were inconsistent with and contradicted by substantial evidence.  And the ALJ cited substantial evidence to support her finding that there was not a marked limitation in the domain of interacting and relating to others but that there was a marked limitation in the domain of caring for oneself.  *See* Tr. 33–35, 39–41.  Despite the potential for overlap of these domains, the ALJ sufficiently articulated her logical process to distinguish between the two domains and cited to the record evidence she attributed to each domain, such that a logical bridge was created that permits us to understand her conclusions.  *See Fleisher,* 774 F. Supp.2d at 877.

For example, in weighing the evidence to determine that T.W. had a less than marked limitation in the domain of interacting and relating with others, she identified that although there were incidents of defiance of authority or harming other students, "this appears to relate to his difficulty with self-control" and the ALJ relied on teacher Coffey's opinion that "[T.W.] was a helpful person when he was in control of himself."  Tr. 40.  In the ALJ's weighing of the evidence, she also highlighted behavior, as described by T.W.'s first grade teacher and family

20

members along with medical providers' assessments, that showed that T.W. had hobbies, a best friend, was involved with and enjoyed group activities and generally had age-appropriate peer behavior.  Tr. 40.  The ALJ also aptly noted that the instances of misbehavior, "meltdowns," were "regularly more manageable after he began treatment."  Tr. 40.  This evidence, in the ALJ's analysis, showed that T.W.'s was not markedly limited in interacting with others; rather he was markedly limited in managing his responses and controlling himself.   Tr. 40, 42.

In her analysis of the domain of caring for yourself, the ALJ articulated several portions of applicable regulations that highlighted that the domain of caring for yourself involves consideration of whether the child can "identify those circumstances when he feels good about himself and when he feels bad," "begin to develop an understanding of what is right and wrong, and what is acceptable and unacceptable behavior," and that "the child should also begin to demonstrate consistent control over his behavior, and be able to avoid behaviors that are unsafe or otherwise not good for him."  Tr. 42 (citing 20 C.F.R. 416.926a(k)(2)(iv) and SSR 09-7p). The ALJ identified that "[T.W.] had difficulty controlling his anger and he reacted with physical violence at times."  Tr. 42.  Again, the ALJ found persuasive the opinion of T.W.'s first grade teacher that he "was a helpful person when he was in control of himself but neither he nor everyone else gets any learnings accomplished when he is out of control."  Tr. 42.  In sum, the ALJ's analysis of the evidence led her to conclude that T.W.'s misbehavior generally arose out of his difficulty in controlling himself appropriately in certain situations and in response to certain scenarios.  Tr. 42–43.  Thus, she found that T.W. was markedly limited in the domain of caring for yourself.  Tr. 42–43.

This appears to be a classic case in which the analysis and application of the SSA rules and regulations under the facts involved could lead to different conclusions depending on how

the evidence is weighed.  In such circumstances, the statutory scheme envisions a "zone of choice" within which the Commissioner could go either way, without interference by the courts. *Blakey*, 581 F.3d at 406.  I conclude that we are not permitted to interfere with the Commissioner's final decision, even though we can readily understand why Garnett might find the differences between the ALJ's decision and the evidence in the record to be difficult to reconcile.

## VII. Recommendation

Because I find that the ALJ has properly considered the evidence in making her findings as to the six domains, specifically the domains of "interacting and relating to others" and "caring for yourself," and that her findings were supported by the substantial evidence, I recommend that the ALJ's decision denying Garnett's claim on behalf of her minor son, T.W., be AFFIRMED.

Dated: December 27, 2023

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, \*2 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).